******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SAMUEL DA SILVA MATOS
*v.* ANA ORTIZ ET AL.
(AC 36895)

DiPentima, C. J., and Gruendel and Sheldon, Js.*

*Argued September 24, 2015—officially released July 12, 2016*

(Appeal from Superior Court, judicial district of judicial district of Windham at Putnam, Boland, J. [motions to cite in, to dismiss]; Riley, J. [motion to enforce; judgment].)

*Samuel da Silva Matos*, self-represented, the appellant (plaintiff).

*Johanna G. Zelman*, with whom, on the brief, was *Michael J. Rose*, for the appellee (named defendant).

*Opinion*

GRUENDEL, J. It is well established that a court may summarily enforce—within the framework of existing litigation—a clear and unambiguous settlement agreement reached during that litigation. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 812, 626 A.2d 729 (1993) (*Audubon*). We are now called upon to decide whether that power extends to the summary enforcement of agreements reached both outside the framework of and before the start of the litigation in which enforcement is sought.

The self-represented plaintiff, former teacher Samuel da Silva Matos, appeals from the judgment of the trial court summarily enforcing the Release and Separation Agreement he signed in 2012,[1] upon resigning his position with the defendant Board of Education of the Town of Windham (board). As part of the Release and Separation Agreement, the plaintiff waived his right to sue the defendant board and its superintendent, defendant Ana Ortiz.[2] When the plaintiff sued the defendants two years later, the court treated that contract, for *Audubon* purposes, as an agreement to settle pending litigation. The court therefore held a hearing, found that the contract was unambiguous and enforceable, and rendered judgment against the plaintiff, ending the litigation while it was still at the pleading stage. We conclude that *Audubon* does not countenance such a result. Rather, a settlement agreement is summarily enforceable under *Audubon* as an agreement to settle litigation only if the parties reached the agreement *after commencing the relevant litigation*. Because the Release and Separation Agreement here fails that test, we reverse the judgment of the trial court and remand the case for further proceedings according to law.

The following facts, as found by the court or otherwise undisputed, are relevant here. The defendants hired the plaintiff in September, 2001, and assigned him teaching duties at the Windham Middle School. During the plaintiff's time at the middle school, he was a member of the local teachers union, the Windham Federation of Teachers.

On November 11, 2011, the defendants received a report from the assistant principal of the middle school that the plaintiff had touched a student on the face, making her uncomfortable. The matter was referred to the Department of Children and Families (department) for investigation, and the defendants simultaneously conducted an internal investigation.

On January 10, 2012, a department worker filed a report substantiating the allegations against the plaintiff for emotional neglect and recommending that he be placed on the department's child abuse and neglect central registry. Ultimately, more than one year later

on March 12, 2013, a department hearing officer rejected that finding and recommendation. The hearing officer determined that the student had not been credible, that the evidence had not supported a finding that the plaintiff had touched her inappropriately, and that any possible violation by the plaintiff of the principal's directive not to touch students *at all* was a matter for the plaintiff's employer, not the department.

On February 28, 2012, on the basis of the initial, January, 2012 report substantiating the allegations against the plaintiff and on the defendants' internal investigation into the plaintiff's alleged violation of the principal's directive that he not touch students at all, the defendants notified the plaintiff that they were commencing termination proceedings against him under General Statutes § 10-151 (d), the Teacher Tenure Act. On March 2, the plaintiff's union appointed attorney, Brian A. Doyle, asked the defendants for a statement of reasons why they had commenced termination proceedings against the plaintiff. The defendants sent such a statement to Doyle on March 12, 2012. In response to the statement of reasons, on March 15, 2012, the plaintiff requested a formal hearing before an impartial hearing officer, pursuant to § 10-151 (d).

Ten days later, on March 25, 2012, the defendants' attorney sent Doyle a document entitled "RELEASE AND SEPARATION AGREEMENT." The Release and Separation Agreement proposed a settlement of the defendants' termination proceeding against the plaintiff on the following terms: the plaintiff would resign immediately from his teaching position, effective June 30, 2012; he would have no teaching duties for the remainder of the school year; and he would never seek to work for the defendants again. The Release and Separation Agreement also included a lengthy release, providing that the plaintiff would "voluntarily [release] and forever [discharge] the Board, all of the Board's past, present and future members, employees, agents, attorneys, insurers, representatives, and any person acting on behalf of or in concert with any of them (collectively, Releasees), from any and all claims, demands, obligations, liabilities, causes of action, known or unknown, asserted and unasserted, and any claim for costs, attorney's fees, expenses or any form of damages whatsoever (including but not limited to liquidated and/or punitive damages, compensatory damages and/or damages for emotional distress) which [the plaintiff] has or may have against the Releasees arising out of or in any way connected with [the plaintiff's] employment or separation from employment . . . ." The preface similarly stated that the plaintiff and the defendants "wish[ed] to resolve, compromise and finally settle . . . any and all claims and potential claims [the plaintiff] may have related to his employment with the Board or separation from that employment . . . ." A separate clause provided that the plaintiff would retain his right

to file a complaint with the federal Equal Employment Opportunity Commission or the Connecticut Commission on Human Rights and Opportunities, but he would waive "the right to recover any damages or other relief in any claim or suit brought by or through" those agencies. Nowhere did the document specify any pending lawsuit that the plaintiff was withdrawing.[3]

In exchange, the Release and Separation Agreement provided that the defendants would put the plaintiff on a paid leave of absence for the last three months of the 2011–2012 school year, until June 30, 2012; would remove all documents referencing the plaintiff's proposed termination from his personnel file; and would not discuss the circumstances of the plaintiff's departure with prospective employers, if the plaintiff sought work elsewhere. On March 30, 2012, during a one-on-one meeting with Doyle at his law firm office, and after being advised to do so, the plaintiff signed the Release and Separation Agreement. It is unclear from the record if the plaintiff ever personally met with the defendants to discuss the Release and Separation Agreement before signing it.

It is undisputed that the plaintiff had no claims pending against the defendants in any court when he signed the Release and Separation Agreement. Nor is there any evidence that he had commenced any administrative actions against the defendants. The evidence before the court contained no indication that, when the plaintiff signed the Release and Separation Agreement, he was considering filing such claims, had investigated the facts underlying such claims, or had consulted with an attorney as to the legal merit of such claims.

Two years later, on January 22, 2014, the plaintiff filed the present action[4] against the defendants, alleging that the defendants had forced him to resign from his job as a teacher through a four year campaign of harassment. The defendants filed two motions in response: (1) a motion to dismiss three of the five counts of the complaint for failure to exhaust administrative remedies;[5] and (2) the "Motion to Enforce the Settlement Agreement" that is the subject of this appeal.

The second motion asked the court to enforce summarily the provision of the Release and Separation Agreement in which the plaintiff had agreed to release the defendants from any liability for the events surrounding his resignation. As authority for their motion, the defendants relied on *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812, in which our Supreme Court held that, where a party conceded that it had entered into an unambiguous, enforceable agreement to settle a pending case, but then reneged on that settlement agreement, the court could summarily enforce the agreement by rendering judgment upon it in the settled case in accordance with the settlement terms. The defendants here

asked the trial court to hold an evidentiary "*Audubon* hearing" to decide whether summary enforcement of the Release and Separation Agreement was appropriate.

Soon after the defendants filed these motions, the court scheduled a hearing for March 31, 2014. One week before the hearing, the defendants moved to continue the "[e]videntiary [h]earing" on their motion to enforce the Release and Separation Agreement because two witnesses would not be available to testify. The court granted that motion on the day it was filed and set a new hearing date of April 14, 2014, ordering that: "All matters scheduled for March 31 are continued to short calendar of April 14, 2014."

A few days after the court postponed the hearing, the plaintiff filed a "Motion in Limine" seeking to preclude any evidence of the Release and Separation Agreement and asking the court to "assist the plaintiff in his endeavor to get at all the material facts [of] this case via the discovery proceedings of the trial." The plaintiff noted that the contract posed a potential "impasse" for his lawsuit against the defendants, and that he "d[id] not wish to be outmaneuvered by the defendant and her counsel until he ha[d] been given a full opportunity to present his case before the court." The plaintiff also filed numerous objections to the defendants' motion to enforce the contract, alleging that there had been bad faith, undue influence, duress, misrepresentation, unconscionability, and a lack of meeting of the minds. The court did not rule on the plaintiff's motion in limine or any other objections before the hearing.

On the day of the hearing, April 14, 2014, the court turned initially to the defendants' motion to enforce the Release and Separation Agreement. The defendants called two witnesses on that motion, the plaintiff and Doyle. The plaintiff testified that he had signed the Release and Separation Agreement on March 30, 2012, and that the defendants' exhibit one was that contract. The court thus admitted the Release and Separation Agreement into evidence. Doyle testified to the same effect.

The plaintiff also testified, in response to questioning by the defendants' counsel, that Doyle had not explained the contract to him, that Doyle had showed the contract to him only briefly, and that he did not receive a copy of the contract until two months after he signed it. At the end of direct examination, the court asked the plaintiff if there was "anything [he] wish[ed] to add" to the testimony he had already given.

The plaintiff then gave a synopsis of the testimony he wished to give and the court asked follow-up questions. At one point, the plaintiff began to discuss his underlying claims against the defendants, but the court stopped him, noting that the hearing was only about

"whether or not this separation agreement can be enforced . . . ." At another point, the plaintiff asked "to get [his] notes" on the "whole subject of contracts" and began to discuss two legal doctrines—misrepresentation and unconscionability—but was cut off again, the court observing: "If you had signed [the Release and Separation Agreement] without benefit of counsel, that may be a subject area in which the court would take some testimony or look into. But you signed this with an attorney representing you." The court noted, however, that the plaintiff "ha[d] the right to put on any—any—we're holding an evidentiary hearing—any other documents that you think are relevant." The plaintiff did not do so.

The defendants next called Doyle to the witness stand. Before Doyle testified, the plaintiff raised his motion in limine seeking to preclude evidence of the Release and Separation Agreement. The court stated that the plaintiff's motion seemed "to be obviated by the fact that we're here today doing an evidentiary hearing." The court then told the plaintiff that because he had testified already about Doyle's failure to explain the Release and Separation Agreement to him, the plaintiff "may in fact have waived some of—some or all of [his] attorney-client privilege . . . ." The court then asked the plaintiff to clarify if he was waiving his attorney-client privilege. The plaintiff replied, "Yes, I'll waive [it]."

On direct examination, Doyle contradicted much of the plaintiff's testimony. He testified that the plaintiff had given him permission to discuss settlement with the defendants; that he had "gone back and forth" with the defendants' attorney; that he had discussed each offer with the plaintiff; that he had given the plaintiff a copy of the Release and Separation Agreement at the meeting where the plaintiff signed it; that he had explained each paragraph to the plaintiff, including that one of the provisions was "a general release and that you can't sue, period"; that the plaintiff had no questions at that time; and that the plaintiff did not ask for any more time to review the Release and Separation Agreement before signing it. Doyle reiterated and expanded on this testimony when the plaintiff cross-examined him.[6]

After the defendants rested, the court asked the plaintiff if he had any witnesses he wished to call. The plaintiff replied, "No, I do not, sir." The court then advised the parties that, if "[a]nybody . . . wishes to submit anything further," the defendants had until April 24, 2014, and the plaintiff had until May 7, 2014.

After the hearing, the plaintiff filed numerous additional objections to the defendants' motion to enforce the Release and Separation Agreement. Although the plaintiff conceded that the contract was unambiguous, he argued that when he signed it he did not know what

it said and was acting under duress.

The plaintiff also asked the court to begin subpoenaing witnesses on his underlying claim that the defendants had harassed him into resigning. He argued that the testimony elicited by the defendants at the April 14, 2014 hearing had been "unreliable and damaging," and that the court should "refrain from ruling on the [defendants' motion] until future testimony [was] presented" on his underlying claims. "Otherwise," he argued, "per terms of the Release and Separation [A]greement, the [p]laintiff would be denied his day in court."

On May 16, 2014, the court granted the defendants' "Motion to Enforce the Settlement Agreement." The court began its memorandum of decision by noting that it had "conducted an *Audubon* hearing on the matter on April 14, 2014." After setting forth the relevant law, the court then found that "[i]t is clear from the testimony presented and evidence received that the parties, at the time they entered into the agreement, were in accord with the terms of the settlement as well as with regard to the terms of the agreement. The entire agreement was clear and unambiguous, and was explained in depth and detail to the plaintiff by his attorney." The court held that the "settlement agreement must be enforced," and did so by rendering judgment in favor of the defendants. The plaintiff appealed to this court.

I

On appeal, the plaintiff argues that our Supreme Court's holding in *Audubon* does not control this case and that the trial court erred in summarily enforcing the Release and Separation Agreement pursuant to *Audubon*. We agree. *Audubon* involved an agreement, reached in the midst of litigation, to settle a pending case. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 806. Here, by contrast, the defendants sought to use that doctrine to enforce summarily a preemptive release signed before the present litigation began. We conclude that *Audubon* does not extend so far. Rather, it permits summary enforcement only if the settlement agreement at issue was reached after the relevant litigation commenced. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings according to law.[7]

A

At the outset, the defendants argue that the issue of whether *Audubon* extends to the summary enforcement of agreements reached outside the framework of and before the start of the relevant litigation is not properly before us. The defendants argue that the plaintiff did not raise this issue before the trial court or on appeal, and that no exceptional circumstance exists to justify

a departure from the "general rule that unpreserved claims will not be reviewed." See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161, 84 A.3d 840 (2014). The defendants are correct that the plaintiff did not specifically object to the use of summary enforcement, rather than summary judgment, as the procedural vessel to dispose of his case. His primary and supplemental appellate briefs focus on the substantive issue of whether the Release and Separation Agreement can be enforced at all, not on the procedural issue of how it could be enforced. Accordingly, we agree with the defendants that the issue is unpreserved and was not raised by the plaintiff on appeal.[8]

In *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–64, our Supreme Court laid out sets of circumstances in which an appellate court may reach and decide an unpreserved issue sua sponte: (1) where the issue involves a question of subject matter jurisdiction;[9] (2) where the issue involves a constitutional violation reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), holding modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015); (3) where the issue is subject to reversal under the plain error doctrine; and (4) where review is appropriate in the exercise of the court's supervisory powers. Here, we conclude that the *Audubon* issue must be reached and decided both under the plain error doctrine and as an exercise of this court's supervisory powers.

1

First, this court "may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." Practice Book § 60-5. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for [the] plain error [doctrine], they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Reville* v. *Reville*, 312 Conn. 428, 467–69, 93 A.3d 1076 (2014). In addition, when the court invokes the plain error doctrine sua sponte, it must provide "an opportunity for the parties to be heard by way of supplemental briefing . . . ." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–62.

In sum, then, an appellate court may reach an unpreserved issue sua sponte, pursuant to the plain error doctrine, if: (1) the parties have had a chance to brief the issue; (2) further factual findings are not needed to resolve the issue; (3) the answer to the issue is so obvious as to be not debatable; and (4) leaving the judgment intact would work a manifest injustice. See id.; *Reville* v. *Reville*, supra, 312 Conn. 467–69. Here, we conclude that each element is met.

First, after discussing the *Audubon* issue extensively at oral argument, we also ordered the parties to submit supplemental briefs on it.[10] The issue has been briefed and argued, and all parties had an opportunity to be heard.[11]

Second, the *Audubon* issue is a pure question of law that requires no additional fact-finding. See *Ayantola* v. *Board of Trustees of Technical Colleges*, 116 Conn. App. 531, 538, 976 A.2d 784 (2009) ("a question of law is [a]n issue to be decided by the judge, concerning the application or interpretation of the law" [emphasis omitted; internal quotation marks omitted]). The question here concerns the scope of a common-law doctrine

and the relevant facts are undisputed, to wit, the Release and Separation Agreement was reached during the defendants' termination proceeding against the plaintiff pursuant to § 10-151 (d), but two years before the plaintiff brought this action.

Third, the answer to the *Audubon* issue is so obvious as to be not debatable. We acknowledge that the court in *Audubon* did not expressly answer the question.[12] It held only that, in one particular circumstance, summary enforcement was appropriate; it did not purport to define that power's outer limits. See *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 810–12. Nevertheless, in light of the two decades since *Audubon* during which courts have applied *Audubon* only to agreements reached in the midst of litigation, and in light of the underlying rationale of *Audubon*, it is obvious that one such limit is that *Audubon* does not apply to agreements reached before and outside the framework of the litigation in which enforcement is sought. See part I B 1 c of this opinion.

Fourth, leaving the judgment intact would work a manifest injustice. The rule of *Audubon* effects a delicate balance between concerns of judicial economy on the one hand and a party's constitutional rights to a jury and to a trial on the other hand. See *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 810–12; see also *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 534–35, 4 A.3d 288 (2010). To use the *Audubon* power outside of its proper context is to deny a party these fundamental rights and would work a manifest injustice. Because all four requirements are met, we conclude that the challenged judgment must be reversed under the plain error doctrine.

2

Second, even if the plain error doctrine did not apply, review would still be proper in the exercise of this court's supervisory powers. Our Supreme Court has laid out a four part test for determining whether sua sponte review of an unpreserved claim pursuant to the court's supervisory powers is proper. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 155–64. The four requirements for review are: (1) the record must be adequate for review; (2) all parties must have had an opportunity to be heard on the issue; (3) there must be no unfair prejudice to any party; and (4) something more, such as (a) neither party objects to review, (b) the party pressing the claim cannot prevail, (c) the claim is of a public character, (d) the claim arose from an intervening change in the law, (e) the claim arose from a newly established, undisputed fact on which both parties rely, (f) by addressing the claim, the court avoids a constitutional question, (g) the claim is an alternative basis

to affirm an evidentiary ruling, (h) the claim involves judicial bias, or (i) other exceptional circumstances; id., 155–61; "in which the interests of justice, fairness, integrity of the courts and consistency of the law significantly outweigh the interest in enforcing procedural rules governing the preservation of claims." Id., 160.

In *Blumberg Associates Worldwide, Inc.*, the 'something more' was threefold: (1) in light of the "obvious similarity between [the] theories"; id., 170; underlying both one of the preserved claims and the unpreserved claim, the Appellate Court reasonably—albeit mistakenly—could have believed that the trial court *had* ruled on the unpreserved claim, which would have mooted the appeal, thereby implicating the Appellate Court's subject matter jurisdiction; (2) the unpreserved claim was likely to arise on remand and so addressing it promoted judicial economy; and (3) the Appellate Court's failure to raise the issue sua sponte could have led to inconsistency or confusion in the case law. Id., 169–72. With respect to the third factor, our Supreme Court noted: "Although it may be improper for the reviewing court to raise an issue sua sponte when the parties' misunderstanding of the law relates to an issue that is tangential to or distinct from the claim that was raised on appeal, we have concluded that a reviewing court may raise the issue when the misunderstanding is intertwined with the claim that was raised on appeal and could lead to problematic or inconsistent precedent." Id., 172 n.43.

To start, we conclude that here, the three preliminary requirements are met. First, the record is adequate for review. The unpreserved issue is a pure question of law and the relevant facts are undisputed—i.e., the Release and Separation Agreement was reached during the defendants' termination proceeding against the plaintiff, pursuant to § 10-151 (d), but two years before the plaintiff brought this action. See *Ayantola* v. *Board of Trustees of Technical Colleges*, supra, 116 Conn. App. 538 ("a question of law is [a]n issue to be decided by the judge, concerning the application or interpretation of the law" [emphasis omitted; internal quotation marks omitted]); *State* v. *Ledbetter*, 41 Conn. App. 391, 394–95, 676 A.2d 409 (1996) ("to determine whether the record is adequate for review, we must consider the specific claim raised, and whether the record provided is adequate for meaningful review of that claim"), aff'd, 240 Conn. 317, 692 A.2d 713 (1997). Second, all parties had an opportunity to be heard on the issue. After discussing this issue extensively at oral argument, we also ordered supplemental briefing. Third, there is no unfair prejudice to any party. The prejudice that the defendants identify in their supplemental brief is that, if the trial court's judgment in their favor is reversed, then they will be "required to expend exorbitant sums of money to defend this matter" instead of "using [these] funds to educate children . . . ." That prejudice stems not

from the *timing* of when the issue was raised—which is the relevant question; see *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 156–57, 156 n.25—but from the plaintiff's right to seek redress in the courts *at all*. See Conn. Const., art. I, § 10 (provision of state constitution granting access to courts).

We thus turn to the fourth requirement. We conclude that two factors counsel in favor of review. First, prior to the order for supplemental briefing, neither party objected to review of this unpreserved issue. At oral argument, the defendants' counsel extensively discussed the merits of the *Audubon* issue and at no point objected that review was improper. In addition to her vigorous defense on the merits, the defendants' counsel specifically requested that this court order supplemental briefing on the issue:

"[The Defendants' Counsel]: Now, Your Honors, I would ask, you know, I'm not sure whether *Audubon* has been applied to these circumstances. . . . I'm not sure that I actually cited to any cases where it was. . . . I certainly would like the opportunity to at least explore the issue and present the court with any . . . cases . . . where it possibly is. . . . I don't have the—those particular citations on hand.

\* \* \*

"And if you're curious as to, you know, whether the—*Audubon* even applies in this case, I would certainly ask, since that wasn't an issue that was even ever—that has not been presented at this time, I would certainly just request time to brief that issue for Your Honors before you make a determination on that basis.

"The Court: You briefed *Audubon*, didn't you?

"[The Defendants' Counsel]: We briefed *Audubon*, but I did not brief, you know, [the plaintiff] never raised the issue that . . . you know, *Audubon* shouldn't be applied to this at all. I—I think that, for the defendants' sake, I—I think that they should have the right to at least brief the argument . . . that . . . *Audubon* wouldn't apply in parallel litigation as opposed to within the same litigation. I—I think that's what I hear as your concerns. . . .

"The Court: We'll certainly take that under consideration, counsel.

"[The Defendants' Counsel]: Okay. Thank you."

Six months after oral argument, we ordered supplemental briefing. The defendants now assert in their supplemental brief that they "vehemently object" to review of the *Audubon* issue, that such review is improper, and that by raising the issue "this court is doing nothing more than serving as an advocate for the [self-represented] plaintiff." We conclude that, having failed to object at oral argument and having themselves

requested supplemental briefing, the defendants cannot now object that such briefing is improper. See *Apple Salon* v. *Commissioner of Public Health*, 132 Conn. App. 332, 334, 33 A.3d 755 (2011) ("[w]aiver is based upon a species of the principle of estoppel and where applicable it will be enforced as the estoppel would be enforced" [internal quotation marks omitted]).

Second, here the parties' "misunderstanding [of the law] is intertwined with the claim[s] that w[ere] raised on appeal and could lead to problematic or inconsistent precedent." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 172 n.43. *Audubon* was the chief authority relied on by the defendants before the trial court. It was the chief authority that the plaintiff cited in his primary appellate brief. And it was the chief authority that the defendants relied on in their primary appellate brief. If we were to uphold the summary enforcement of the Release and Separation Agreement pursuant to *Audubon* in this case, it would improperly suggest to courts and attorneys alike that *Audubon* extends far beyond its actual reach. Accordingly, we conclude that review is also proper to avoid such a result.

B

We thus turn to the merits. In *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 804, our Supreme Court announced a procedure for enforcing agreements to settle litigation. That procedure, as expanded by later cases, carves out a de facto exception to the right to trial by jury insofar as it permits a court to resolve issues of fact en route to summarily enforcing such an agreement, even in the face of a jury demand. See *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 534–35 (despite jury demand, *court* may resolve issues of *fact* if necessary for summary enforcement). It also deviates markedly from the normal procedure for enforcing a release of claims. See, e.g., *Young* v. *Data Switch Corp.*, 231 Conn. 95, 96, 646 A.2d 852 (1994) (release of claims sent to jury as special defense to plaintiff's underlying action at law); *Mandeville* v. *Jacobson*, 122 Conn. 429, 430–32, 189 A. 596 (1937) (same); *Embalmers' Supply Co.* v. *Giannitti*, 103 Conn. App. 20, 47, 929 A.2d 729 (same), cert. denied, 284 Conn. 931, 934 A.2d 246 (2007); *Gillis* v. *Gillis*, 21 Conn. App. 549, 552–53, 553 n.3, 575 A.2d 230 (same), cert. denied, 215 Conn. 815, 576 A.2d 544 (1990); cf. *Lawton* v. *Weiner*, 91 Conn. App. 698, 714 n.10, 882 A.2d 151 (2005) ("[r]elease [of claims], which goes to liability, must be pleaded as a special defense").

Historically, courts have summarily enforced releases pursuant to *Audubon* only when they were parts of agreements to end litigation, reached during that litigation. *Audubon* itself referred to "[a]greements that *end* lawsuits"; (emphasis added; internal quotation marks omitted) *Audubon Parking Associates Ltd. Part-*

*nership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811; and concerned the court's power to render judgment "*within the framework of the original lawsuit . . . .*" (Emphasis added.) Id., 812; see also id., 811 ("[a] court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court *during the course of a trial* or other significant courtroom proceedings" [emphasis added; internal quotation marks omitted]). Here, however, the defendants seek to apply *Audubon* to a Release and Separation Agreement that they argue settled claims, which, at the time of signing, the plaintiff's attorney was not pursuing, which had not yet fully accrued, and which the plaintiff raised for the first time nearly two years later when he filed the present action. We conclude that such a preemptive release may not be summarily enforced under *Audubon* as an agreement to settle that litigation.

1

We begin by reviewing the law of *Audubon*-style summary enforcement. In short, what began in *Audubon* as a summary judgment motion by another name has evolved into an exception to the jury right, allowing the court—rather than the jury—to resolve factual disputes en route to disposing of an action as barred by a release of claims, even in the face of a jury demand. As context for the evolution of that procedure, we start by reviewing the jury right from which it deviates.

a

The jury right—from which *Audubon*-style summary enforcement deviates by allowing the court, rather than the jury, to resolve issues of material fact—is well established. "The right to a jury trial is fundamental in our judicial system, and . . . includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded [people] passed upon by the jury and not by the court." *Howard* v. *MacDonald*, 270 Conn. 111, 128, 851 A.2d 1142 (2004). "The right to a jury trial in Connecticut originates from article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, which provides in relevant part that '[t]he right of trial by jury shall remain inviolate . . . .' This particular provision of the constitution has been construed by Connecticut courts to mean that if there was a right to a trial by jury at the time of the adoption of the provision, then that right remains intact." *Welles* v. *Lichaj*, 136 Conn. App. 347, 352, 46 A.3d 246, cert. denied, 306 Conn. 904, 52 A.3d 730 (2012).

In Connecticut, as elsewhere, the fundamental nature of the jury right is also reflected in the high bar that a party must overcome to dispose of a case by motion, without a jury. So long as a court has jurisdiction, it cannot grant such a motion if even one issue of material

fact remains to be resolved. See *Stuart* v. *Freiberg*, 316 Conn. 809, 821, 116 A.3d 1195 (2015) ("The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts . . . . A material fact . . . [is] a fact which will make a difference in the result of the case." [Internal quotation marks omitted.]); *Haynes* v. *Middletown*, 314 Conn. 303, 312, 101 A.3d 249 (2014) ("a motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict" [internal quotation marks omitted]); *Mueller* v. *Tepler*, 312 Conn. 631, 647, 95 A.3d 1011 (2014) ("[i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied" [internal quotation marks omitted]); *Connell* v. *Colwell*, 214 Conn. 242, 247, 571 A.2d 116 (1990) (test for directing verdict is same as test for granting summary judgment motion); cf. *Cuozzo* v. *Orange*, 315 Conn. 606, 616, 109 A.3d 903 (2015) (where party moves to dismiss for lack of *jurisdiction*, and "*jurisdictional* determination is dependent on the resolution of a critical factual dispute . . . [the court must hold] an evidentiary hearing to establish *jurisdictional* facts" [emphasis added; internal quotation marks omitted]). Our Supreme Court has noted that these "well established standards," which forbid a court from taking an issue of material fact from the jury, compel "great deference to the historical function of the jury" and "find their roots in the constitutional right to a trial by jury." (Internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 856, 37 A.3d 700 (2012).

b

*Audubon* itself—the first case to recognize a right to enforce summarily an agreement to settle litigation—was entirely consistent with the jury's historical function, because it held only that a court could summarily enforce such an agreement "as a matter of law" and did not hold that the court could decide issues of fact. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811–12. The procedure used in *Audubon* was identical to that of a motion for summary judgment. See Practice Book §§ 17-44 ("any party may move for a summary judgment as to any claim or defense . . . *at any time* . . . [but if] the case has been assigned for trial, a party must [first] move for permission" [emphasis added]) and 17-49 ("[summary] judgment . . . shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment *as a matter of law*" [emphasis added]).

In *Audubon*, the parties to a breach of lease action told the judge—on the record, in open court, in the midst of jury selection for the trial—that they had agreed to settle the entire matter for $50,000. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 806; see also id. (defen-

dants' attorney told court, "I do want the record to be clear that we do have a settlement" [internal quotation marks omitted]). The defendants later reneged on the settlement agreement, the plaintiff moved to enforce the settlement, and the trial court granted the plaintiff's motion to enforce, rendering a judgment of $50,000 in favor of the plaintiff. Id., 806–807. On appeal, the defendants conceded that they had agreed to settle the case for $50,000 and that the settlement agreement was binding. Id., 808. The defendants argued, however, that the court could not simply render judgment in favor of the plaintiff in accordance with the terms of the settlement agreement. Rather, the defendants argued, the plaintiff had to bring a new, separate action for breach of the settlement agreement. Id., 811. Our Supreme Court stated that it "ha[d] not previously considered this narrow question" of the proper procedure for enforcing a settlement agreement. Id.

Our Supreme Court held that "a trial court may summarily enforce a settlement agreement *within the framework of the original lawsuit* as a matter of law when the parties do not dispute the terms of the agreement." (Emphasis added.) Id., 812. The court relied on federal precedent that a "court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings"; (internal quotation marks omitted) id., 811; and that "[t]his authority should normally be exercised whenever settlements are announced in the midst of a trial." (Internal quotation marks omitted.) Id., 812. The court noted that summary enforcement was both "essential to the efficient use of judicial resources" and necessary to vindicate the settling parties' "right to *avoid* a trial." (Emphasis in original.) Id.

The next step came when our Supreme Court extended *Audubon* to permit the court to resolve not just issues of law, but also issues of fact, in *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 495. In that case, after mediation before a judge and one week before jury selection, the parties exchanged letters and phone calls outside of court,[13] ultimately reaching a global settlement of the case. Id., 499–503, 517. The plaintiffs later reneged, arguing that they had not wanted to settle and that their attorney never had authority to settle on their behalf. See id., 498, 505 n.6. Our Supreme Court acknowledged that the "nature and extent of an agent's authority is a question of fact for the trier"; (internal quotation marks omitted) id., 507; but held nevertheless that the plaintiffs had no right to a jury trial on the factual issue of their attorney's authority to settle. Id., 534–35. The court reasoned that one has a right to a jury trial for an action at law but not for an action in equity. Id., 532. Although the plaintiffs may have had a right to a jury trial on their underlying

contract and tort claims—which were actions at law—they had no right to a jury trial on the factual issues raised by the defendant's *motion to enforce*—which was essentially an action in equity for specific performance of the settlement agreement. Id., 534–35. Accordingly, the court did not err in resolving those factual disputes itself and then summarily enforcing the settlement agreement that it found existed.[14] Id., 530–31.

In so holding, the court in *Ackerman* implicitly approved a line of *Audubon* progeny that had empowered trial courts to find facts where necessary to summarily enforce a settlement agreement. See, e.g., *McCook* v. *Whitebirch Construction, LLC*, 117 Conn. App. 320, 329, 978 A.2d 1150 (2009) ("the record supports the court's [factual] finding that the parties reached a mutual understanding with respect to the settlement agreement"), cert. denied, 294 Conn. 932, 987 A.2d 1029 (2010); *DAP Financial Management Co*. v. *Mor-Fam Electric, Inc.*, 59 Conn. App. 92, 98, 755 A.2d 925 (2000) ("What the plaintiff really seeks is to have us believe his witnesses rather than the witnesses proffered by the defendants. . . . We are bound by the court's finding that no dispute existed between the parties at the time their counsel reached a settlement." [Citation omitted.]); *Sicaras* v. *Hartford*, 44 Conn. App. 771, 786, 789, 692 A.2d 1290 ("[T]he plaintiff claims that he was under duress at the time he agreed to the settlement . . . . The trial court heard extensive testimony on this issue . . . . We conclude that [the trial court did not clearly err in finding that] the plaintiff was not under duress." [Citations omitted.]), cert. denied, 241 Conn. 916, 696 A.2d 340 (1997); see also *Orange Palladium, LLC* v. *Readey*, 144 Conn. App. 283, 298, 72 A.3d 1191 (2013) ("it was not clearly erroneous for the court to decline to find that the parties had orally agreed . . . to alter the defendant's obligations under the settlement agreement"); *Hogan* v. *Lagosz*, 124 Conn. App. 602, 609, 6 A.3d 112 (2010) ("[i]n the present case, the court found that [the defendant's attorney] had apparent authority to sign the [settlement] agreement on the defendant's behalf"), cert. denied, 299 Conn. 923, 11 A.3d 151 (2011).

There appear to be two limits on a court's power to resolve factual disputes en route to summarily enforcing a release of claims, namely, that the agreement at issue must: (1) be an agreement to settle the litigation; and (2) clearly and unambiguously set forth all of its material terms.

The second limit—that the terms of the purported agreement must be clear and unambiguous—is well established. See *Ballard* v. *Asset Recovery Management Co.*, 39 Conn. App. 805, 810 and n.3, 667 A.2d 1298 (1995) ("[b]ecause the contract was unclear and ambiguous on its face . . . [w]e are not persuaded that we should go beyond the boundaries of *Audubon* . . . and create

a limited dispute hearing by judicial fiat where the terms of a purported settlement agreement are disputed" [internal quotation marks omitted]), cert. denied, 236 Conn. 906, 670 A.2d 1306 (1996). In nearly every case in which this court has denied *Audubon* enforcement, we have done so because the alleged agreement failed to set forth clearly and unambiguously all of its material terms. See *Santos* v. *Massad-Zion Motor Sales Co.*, 160 Conn. App. 12, 14, 123 A.3d 883 (parties agreed to include confidentiality provision but never agreed on what it would say), cert. denied, 319 Conn. 959, 125 A.3d 1013 (2015); *WiFiLand, LLP* v. *Hudson*, 153 Conn. App. 87, 106, 100 A.3d 450 (2014) (same); *Kidder* v. *Read*, 150 Conn. App. 720, 731, 735, 93 A.3d 599 (2014) (parties agreed on payment amount but not on payment plan); *Amica Mutual Ins. Co.* v. *Welch Enterprises, Inc.*, 114 Conn. App. 290, 293, 970 A.2d 730 (2009) (parties agreed on payment amount but not on whether plaintiff must also secure release of claims from third party); *Ballard* v. *Asset Recovery Management Co.*, supra, 808 (parties agreed defendants must reimburse plaintiffs for "all the extras [the plaintiffs'] clients have paid for" but "extras" was unclear and ambiguous [internal quotation marks omitted]).

The first requirement—that the release of claims at issue be part of an agreement to settle the litigation— is discussed less often because, at least in the cases that have reached this court, it almost always has been met. In the one case that arguably discussed it, a husband tried to enforce his wife's statement that she would not object to selling certain marital property— which she made on the witness stand during cross-examination at their marital dissolution trial, but recanted on redirect—as if it were an agreement to settle that litigation. *Brycki* v. *Brycki*, 91 Conn. App. 579, 585, 881 A.2d 1056 (2005). The court, after noting that it was unclear whether any such agreement existed in light of the wife's contrary testimony on redirect, went on to say that it was "unwilling to extend the rule in *Audubon* . . . to representations made by a party witness under the inquiry of cross-examination and where the witness has had no opportunity to consult privately with her attorney regarding the legal consequences of those representations."[15] Id., 587. Accordingly, we turn to a more detailed discussion of the requirement that the release of claims at issue be part of an agreement to settle the litigation.

c

We conclude that for a contract to be an agreement to settle litigation subject to *Audubon* enforcement, it must be reached after that litigation commenced. We reach this conclusion because the commencement of an action first invokes the authority of the court, which then acquires its own interest in enforcing any settlement reached.

The summary enforcement power recognized in *Audubon* and progeny is grounded in the court's own interest in managing the matters before it. That interest comprises both the court's interest in efficient docket management; see *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812 ("[s]ummary enforcement is . . . essential to the efficient use of judicial resources"); and the court's interest in the integrity of judicial proceedings; see id., 811 ("[a] court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant court-room proceedings" [internal quotation marks omitted]).

In the majority of cases where settlement agreements have been summarily enforced pursuant to *Audubon*, the agreement at issue was either read directly into the record or otherwise reported to the court.[16] In the cases where a settlement agreement was not directly presented to the court in full, it nevertheless was in some sense placed before the court during pending litigation. *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 499 ("[a]t the time the [pretrial] mediation was concluded, a settlement had not been reached . . . although [the mediating judge] did remain active in further negotiations between the parties," which ultimately resulted in a settlement agreement reached through out-of-court letters and phone calls, one week before trial [internal quotation marks omitted]); see id., 517; *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 600–601, 799 A.2d 1027 (2002) (after "[t]rial on the matter commenced . . . the parties informed the court that they had reached an agreement in principle" but finalized details later, during out-of-court negotiations); *Tirreno* v. *The Hartford*, 161 Conn. App. 678, 681, 129 A.3d 735 (2015) ("[f]ollowing a pretrial conference . . . [settlement] terms were agreed to orally, memorialized in a series of e-mails exchanged between counsel, and later testified to by [the reneging party's] counsel [before the court at an *Audubon* hearing]").

We have never extended *Audubon* to agreements that, when made, remained wholly outside the court's domain because no one had yet invoked the court's jurisdiction through service of a summons and complaint. That initial invocation of the court's authority distinguishes an agreement to settle litigation—which may be summarily enforced by *Audubon* motion—from a preemptive release of claims—which may be enforced through a motion for summary judgment or by presentation at trial as a special defense. When an agreement is made to settle a matter *pending before the court*— i.e., after the litigation has commenced—the swifter remedy of *Audubon* summary enforcement is justified

to protect the integrity of the judicial process.

We thus conclude that, to qualify as an agreement to settle litigation for purposes of *Audubon*-style summary enforcement, an agreement must be reached after the relevant litigation commenced.

2

Applying that rule to the Release and Separation Agreement, we conclude that it was not an agreement to settle litigation then pending in court, such as may be summarily enforced pursuant to *Audubon*. Here, the Release and Separation Agreement was finalized nearly two years before the plaintiff raised those claims, for the first time, in the present action. The defendants argue, however, that the Release and Separation Agreement did settle their administrative proceeding under § 10-151 (d) to terminate the plaintiff's employment, and so the contract's provisions—including its general release provision—were subject to *Audubon*-style summary enforcement. We disagree. An employer's action to terminate its employee does not morph into litigation merely because that termination is done pursuant to the formal procedures of § 10-151 (d).[17]

In sum, while the release may still be enforceable through ordinary procedural channels, these are hardly the circumstances that give rise to a right to summary enforcement under *Audubon*. Cf. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 806–807 ("During jury selection, the parties represented on the record, in open court before the trial judge . . . that they had agreed to settle the entire matter, including the claims asserted in the complaint and the counterclaim, for a sum of $50,000. . . . Counsel for the defendants then said: 'I do want the record to be clear that we do have a settlement.' . . . [T]he defendants [then] failed to abide by the terms of the settlement . . . ." [Footnote omitted.]). Accordingly, we conclude that the court improperly rendered judgment in favor of the defendants at this juncture.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Although the defendants refer throughout their pleadings to a "Settlement Agreement," and the trial court largely adopted that nomenclature in its memorandum of decision, the document is titled "Release and Separation Agreement." We refer to it by its actual name.

[2] The defendants' identities are not entirely clear. The plaintiff's complaint was captioned "SAMUEL d. MATOS VS. ANA ORTIZ, SUPERINTENDENT, WINDHAM PUBLIC SCHOOLS, ET AL." and had counts directed at "Windham Public Schools" and "WFT." The summons named as defendants "Ana Ortiz, Superintendent of Windham Public Schools," and "Randall Prose, President of Windham Federation of Teachers." As the defendants note in their brief, the plaintiff later moved to cite in the board, which motion was granted.

As to Prose, in his capacity as president of the union, he moved early on to dismiss the complaint against him on the ground that the plaintiff had

failed to exhaust the administrative remedy of a hearing before the State Board of Labor Relations. The court granted Prose's motion on March 4, 2014, and the plaintiff has not appealed from that judgment. Accordingly, the board and Ortiz in her capacity as its superintendent appear to be the two remaining defendants on appeal, whom we refer to collectively as the defendants.

[3] The defendants acknowledged at oral argument before this court that no such lawsuit existed at that time.

[4] In his original five count complaint, the plaintiff alleged that (1) the Windham Public Schools negligently investigated him for child abuse; (2) the Windham Public Schools reported the suspected abuse to the department without reasonable cause, violating his first amendment right to freedom of expression; (3) the Windham Public Schools harassed him; (4) the Windham Federation of Teachers and Doyle failed to protect the plaintiff's fourteenth amendment right to due process, which, in turn, violated both the plaintiff's first amendment right to freedom of speech, and the Rules of Professional Conduct; and (5) the Windham Public Schools and Windham Federation of Teachers wrongly suggested that the plaintiff resign.

[5] The court never ruled on this motion.

[6] The relevant portion of cross-examination was as follows:

"[The Plaintiff]: . . . Do you recall any of the specific points on this Release and Separation Agreement that we discussed?

"[Doyle]: We went through the separation agreement. I explained to you that you were going to get paid 'til the end of the year; that you—that the board would be limited as to what it could say regarding you; that it would say that you resigned effective June 30th, and it was going to be limited to that type of language. They weren't going to be able to—they weren't going to be able to go any farther than that. It had the general release in it that you couldn't sue over anything.

"[The Plaintiff]: That I couldn't?

"[Doyle]: Couldn't. Those were some of the high points.

"[The Plaintiff]: What about the [Commission on Human Rights and Opportunities] aspect?

"[Doyle]: There's a paragraph in there regarding [the Commission on Human Rights and Opportunities]; that you—that you can bring an action, but you can't—you can't—you can't get any benefit out of that action.

"[The Plaintiff]: Right. All right. Well, okay. You knew, Attorney Doyle, that I wanted to keep my job; did you not?

"[Doyle]: No, I didn't know that, Mr. Matos, because you signed that agreement, and you had previously discussed with me you didn't want to work for the Windham School District.

"[The Plaintiff]: I did—I said I didn't want to?

"[Doyle]: You did say that.

"[The Plaintiff]: Or was it, Attorney Doyle, that you said that?

"[Doyle]: I didn't say that.

"[The Plaintiff]: Attorney Doyle, the General Statutes § 10-151—

"[Doyle]: Yes, sir?

"[The Plaintiff]: Why wasn't that—why didn't we go that route?

"[Doyle]: Because you agreed to settle the claim, as opposed to going forward with the hearing.

"[The Plaintiff]: I never agreed to that.

"The Court: You can't make statements.

"[The Plaintiff]: Okay. I can't—I can't make statements. Okay. . . . How did I say that, Attorney Doyle?

"[Doyle]: You had me enter into negotiations with the board's attorney and you executed the settlement agreement. . . .

"[The Plaintiff]: And [the letter stating that my employment was to be terminated] also stated that I was to be terminated according to the General Statutes [§ 10-151]—the procedure.

"[Doyle]: That's right.

"[The Plaintiff]: And you mean to tell me that I gave that up?

"[Doyle]: Mr. Matos, you settled the case in lieu of going to the administrative trial under § 10-151."

[7] We hold only that the Release and Separation Agreement was not *summarily enforceable*, pursuant to *Audubon* and its progeny. We offer no opinion on whether the release is nevertheless enforceable through the ordinary procedural channels, for example, by pleading the release as a special defense and then moving for summary judgment on that basis.

[8] Our Supreme Court has held that the standard for reviewing an unpreserved issue that was raised on appeal is identical to the standard for reviewing an unpreserved issue that was not raised on appeal. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–62.

[9] In such cases, review is mandatory. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161.

[10] The order instructed the parties to file simultaneous supplemental briefs addressing the following question: "Whether the summary enforcement power announced in *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, [supra, 225 Conn. 812], extends to the summary enforcement of agreements, purporting to settle litigation, but reached both outside the framework of and before the start of the litigation in which enforcement is sought."

[11] The defendants also had an opportunity to address the *Audubon* issue before the trial court, when they moved to summarily enforce the Release and Separation Agreement on the ground that *Audubon* permitted such relief.

[12] That the issue is one of first impression does not preclude plain error review. See, e.g., *State* v. *Velasco*, 253 Conn. 210, 218 n.9, 751 A.2d 800 (2000) (invoking plain error doctrine to reach unpreserved issue of first impression as to construction of statute); *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 37, 39, 664 A.2d 719 (1995) ("we reach this issue under the plain error rule" where "for the first time, we are asked to decide whether a plaintiff may be awarded prejudgment interest under the [Connecticut Antitrust Act, General Statutes § 35-24 et seq.]"); *Madison Hills Ltd. Partnership II* v. *Madison Hills, Inc.*, 35 Conn. App. 81, 83–84, 90, 644 A.2d 363 (noting that "[o]ur research has revealed no reported cases" that adjudicate the "difficult [unpreserved] question . . . presented in this case" as to construction of Uniform Partnership Act [General Statutes § 34-39 et seq.], and reaching it pursuant to plain error doctrine), cert. denied, 231 Conn. 913, 648 A.2d 153 (1994); *Walker* v. *Lombardo*, 2 Conn. App. 266, 269, 477 A.2d 168 (1984) (noting that "[t]here is no Connecticut case which is dispositive of the particular [unpreserved] issue of this case," as to rules governing summary judgment, and reaching it without expressly invoking plain error doctrine); but see *State* v. *Fagan*, supra, 280 Conn. 88 ("the question . . . is an issue of first impression . . . [and so] we cannot conclude that the trial court committed a clear and obvious error").

[13] The opinion notes that after the mediation, the mediation judge "remain[ed] active in further negotiations between the parties," but the precise extent of judicial involvement in the parties' settlement is unclear. (Internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 499.

[14] Curiously, nothing in the reasoning of *Ackerman* is unique to settlement agreements. If a defendant moved to enforce summarily a contract of whatever kind, that motion would also be "essentially" a claim for specific performance and so, on the logic of *Ackerman*, the plaintiff could not demand that a jury decide disputes of fact material to its resolution, no matter that the underlying claims were actions at law. Cf. *Barber* v. *Baldwin*, 135 Conn. 558, 564–65, 67 A.2d 1 (1949) (court may itself resolve disputes of fact material to defendant's equitable counterclaim, and if those findings dispose of plaintiff's underlying action at law, plaintiff is not entitled to jury trial of it).

[15] The court also noted two other grounds for denying summary enforcement: (1) General Statutes § 46b-66 required judicial approval of any settlement agreement; and (2) *Audubon* required both parties to "assent in open court to each provision of the claimed agreement." *Brycki* v. *Brycki*, supra, 91 Conn. App. 586–88. We do not discuss these alternative grounds because the requirement of judicial approval is unique to family law cases; id., 587; and, as to assent in open court, more recent cases have not regarded it as an independent requirement; see, e.g., *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 498–99, 517 (affirming summary enforcement of settlement agreement finalized during out-of-court phone call although, at court hearing, plaintiffs denied agreement existed). Accordingly, the better reading of the open court requirement in *Brycki* is that the court meant that either the parties must assent to the settlement agreement in open court *or otherwise manifest their intent to be bound by it*. See *Brycki* v. *Brycki*, supra, 587–88 (citing as support *Sicaras* v. *Hartford*, supra, 44 Conn. App. 777–78, which noted that declaration in open court was acceptable substitute for signing agreement). In short, a settlement agreement is a contract and so it must meet the formal requirements of a contract, including that the parties in some way manifest their intent to be bound. See *Steeltech Building Products, Inc.* v. *Edward Sutt Associates, Inc.*, 18 Conn. App. 469, 471–72, 559 A.2d 228 (1989) (existence of contract determined by whether parties manifested intent to be bound). Declaration in open court appears to be one way of meeting this requirement, rather than a separate requirement in itself.

[16] See *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 806 (settlement agreement was stated "on the record,

in open court before the trial judge"); *Banziruk* v. *Banziruk*, 154 Conn. App. 605, 608, 109 A.3d 494 (2014) ("A trial date was scheduled for February 20, 2013, at which time the [parties'] . . . counsel told the court that the parties had reached an agreement. The settlement agreement was placed on the record, and the court canvassed all of the parties to ensure that the terms were acceptable to everyone involved."); *Orange Palladium, LLC* v. *Readey*, supra, 144 Conn. App. 286–87 (on "the eve of trial, the parties reached an agreement . . . [which the] plaintiff's counsel read . . . into the record"); *Reid & Riege, P.C.* v. *Bulakites*, 132 Conn. App. 209, 211, 31 A.3d 406 (2011) ("[T]he parties attended a pretrial conference at which they agreed to participate in court-annexed mediation . . . . As a result of the mediation, the parties reached an agreement. Counsel for the parties appeared before the court . . . at which time the plaintiff's counsel stated the agreement for the record."), cert. denied, 303 Conn. 926, 35 A.3d 1076 (2012); *Vance* v. *Tassmer*, 128 Conn. App. 101, 104, 16 A.3d 782 (2011) ("[o]n . . . the eve of trial, the parties reached a settlement agreement . . . [which] was signed by all of the parties . . . and was placed on the record before the court" [internal quotation marks omitted]), appeal dismissed, 307 Conn. 635, 59 A.3d 170 (2013); *Massey* v. *Branford*, 118 Conn. App. 491, 493, 985 A.2d 335 (2009) ("after extensive discovery and on the eve of trial . . . the parties drew up a handwritten document entitled 'settlement' . . . [and] notified the court of the agreement"), cert. denied, 295 Conn. 913, 990 A.2d 345 (2010); *McCook* v. *Whitebirch Construction, LLC*, supra, 117 Conn. App. 323 ("[a]t the conclusion of [a second pretrial] conference, counsel for [the parties] reported to the court . . . that a global settlement agreement had been reached in all three cases . . . [and] followed up with a letter memorializing the agreement"); *Rosenblit* v. *Laschever*, 115 Conn. App. 282, 284–85, 972 A.2d 736 (2009) ("at a pretrial hearing before the court . . . the defendant entered into an agreement and stipulation to settle the action . . . [and] answered affirmatively to the questions posed by [the judge] as to whether he had an adequate opportunity to consider the terms"); *Waldman* v. *Beck*, 101 Conn. App. 669, 670 n.1, 671, 922 A.2d 340 (2007) (defendant conceded on appeal that "at a . . . pretrial conference, the parties had reached an agreement to settle the matter"); *DAP Financial Management Co.* v. *Mor-Fam Electric, Inc.*, supra, 59 Conn. App. 93–94 ("Approximately one week before trial . . . [t]he defendants' counsel wrote to the plaintiff's counsel iterating the defendants' $20,000 settlement offer . . . . [The] plaintiff's counsel responded that the plaintiff had accepted the offer . . . confirmed his oral representation by facsimile . . . [and] informed the court that the matter had settled."); *Sicaras* v. *Hartford*, supra, 44 Conn. App. 772 ("before beginning trial, the parties signed a settlement agreement that was read onto the record in open court on the same day").

[17] But see *Sekor* v. *Board of Education*, 240 Conn. 119, 125, 689 A.2d 1112 (1997) ("[w]hen considering termination of a tenured teacher's employment contract [pursuant to § 10-151 (d)], a school board acts, like an administrative agency, in a quasi-judicial capacity" [internal quotation marks omitted]).